**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RBG PLASTIC LLC d/b/a Restaurantware an Illinois company, | ) ) ) | Civil Action No. 17-cv-6283 |
| Plaintiff/Counter-Defendant, | ) ) | Hon. Manish S. Shah |
| v. | ) ) ) | |
| FIRST PACK LLC d/b/a Pack N Wood, a New York company | ) ) ) | |
| Defendant/Counter-Plaintiff. | ) | |

**MEMORANDUM IN SUPPORT OF PNW'S MOTION TO EXCLUDE OPINIONS OF
RESTAURANTWARE'S EXPERT**

Steven L. Baron (ARDC 6200868)
George V. Desh (ARDC 6305733)
sbaron@mandellmenkes.com
gdesh@mandellmenkes.com
Mandell Menkes LLC
1 North Franklin St., Suite 3600
Chicago, IL 60606
Phone: (312) 251-1009

*Attorneys for Defendant, FIRST PACK LLC
d/b/a Pack N Wood*

Defendant/Counter-Plaintiff First Pack LLC d/b/a Pack N Wood ("PNW") moves to exclude the opinions of RBG Plastic LLC d/b/a Restaurantware's ("Restaurantware") expert, Bill Hartzer under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and Fed. R. Evid. 702. Mr. Hartzer presents himself as an expert in "search engine, internet marketing, and domain name industries," and offers opinions primarily regarding the use of slogans on certain foreign websites—not PNW's website—that he believes will result in losses of $61 million to Restaurantware over ten years. His opinions should be excluded for several reasons.

First, his opinions regarding the use of a slogan on foreign websites are simply not *relevant* to this case, as Restaurantware's complaint alleges damages from PNW purportedly bidding on certain search terms, *not* the use of any slogans on any foreign websites. As the Court found when denying Restaurantware's motion to reopen fact discovery on the relationship between PNW and the foreign websites:

> This complaint alleges that the breach is this particular defendant's purchase or bid of search terms. That's what's alleged in the complaint. There is no good cause to reopen fact discovery on an issue that's not relevant to the theory of liability that's alleged in the complaint[.]

(Ex. 1, 02/14/2019 Hr'g Tr. at 7:17-21.)

Second, Mr. Hartzer is no more *qualified* to opine on the corporate relationship between PNW and any foreign websites or companies—simply by visiting public websites—than any fact witness or finder of fact. And even if he was, these opinions would still be *irrelevant*, because as the Court told Restaurantware:

> whether parents or affiliates breached the settlement agreement is outside the scope of this case. This suit is against First Pack, L.L.C. If you have a lawsuit against a different entity, that might very well be a different lawsuit. That's not this case.

(*Id.* at 7:12-16.)

Third, even if the use of slogans by foreign websites was relevant to this case, and even if Mr. Hartzer was qualified to opine that PNW owns or controls these websites, Mr. Hartzer's methodology for calculating damages to Restaurantware is completely *unreliable*. His methodology is based on the premise that anyone who ever bought a product on a foreign website that contained the slogan—to be clear the slogan did not appear on PNW's site—would have otherwise bought it from Restaurantware, because a slogan was driving 100% of all traffic and sales. As PNW's expert points out, this is facially implausible and would be like saying if Adidas used Nike's slogan "just do it" on its website, every customer who purchased a product on Adidas' website would have otherwise purchased a Nike product (regardless of whether they came to Adidas' website because of the slogan, preferred Adidas products, or hundreds of other factors that impact consumer behavior).[1]

Finally, while the majority of Mr. Hartzer's report focuses on the use of slogans on foreign websites, he does offer some opinions regarding PNW's purported bidding on prohibited search terms. However, Mr. Hartzer either asks the Court to "take his word" or provides a few facially deficient searches to support these opinions. These opinions should be stricken as well.

**I.　BACKGROUND**

To resolve a previous litigation, Restaurantware and PNW entered into a settlement agreement on December 7, 2016 (Ex. 2, the "Agreement"). Paragraph 5.a. of that Agreement prohibited PNW from using certain slogans, although PNW had no obligation to recall "printed material" that contained these slogans. Paragraph 5.b. prohibited PNW from bidding on any online search term that used the phrases in Paragraph 5.a.[2], as three additional keywords.

---

[1] And, Mr. Hartzer's analysis is even more unrealistic, since "just do it" is one of the most famous and popular slogans of all time, as opposed to the relatively unknown slogan at-issue in this case.
[2] While the Agreement in Paragraph 5.b. refers to Paragraph 3.a., that is a typographic error and should have referred to Paragraph 5.a.

Restaurantware's Amended Complaint and MIDP disclosures presented a theory of liability based on PNW purportedly bidding on prohibited search terms (Paragraph 5.b.), not the use of a slogan on any website (Paragraph 5.a.). (Dkt. 8, ¶¶ 12-13, 17-18; Dkt. 35-1, MIDP Disclosures at 3-4). Nor has Resturantware ever amended its complaint or supplemented its MIDP disclosures to allege otherwise, even though, as the Court found, "plaintiff had enough time to develop that and seek amendment of the complaint during a schedule that we had in place, but that didn't happen." (Ex. 1, 02/14/2019 Hr'g Tr. at 7:23-25.)

Only on July 26, 2018, on the eve of the close of fact discovery on August 31, 2018 (*see* Dkt. 23), did Restaurantware, for the first time, expressly identify the use of slogans on certain foreign websites as the basis for its claims, arguing that foreign entities with these websites were "related companies," bound by the Agreement. (Dkt 32 at 7-8).[3] Restaurantware also recently sought to reopen fact discovery on the relationship between PNW and the foreign companies that operated these websites, but the Court denied Restaurantware's motion. (*See* Dkt. 36.)

After fact discovery closed on August 31, 2018, Restaurantware's expert, Mr. Hartzer, submitted his expert report on October 12, 2018. The report devotes little attention to the bidding on prohibited search terms (the liability theory alleged in the Amended Complaint), and focuses on the use of prohibited slogans by foreign websites. (Ex. 3, Hartzer Expert Report.) On November 30, 2018, PNW submitted a rebuttal report of its expert, Dr. Kinshuk Jerath, responding to Mr. Hartzer's opinions. (Ex. 4, Jerath Rebuttal Report). PNW now moves to exclude certain opinions of Mr. Hartzer.

---

[3] In April of 2018, PNW issued discovery to Restaurantware, asking directly whether Restaurantware accused PNW of breaching paragraph 5.a., as the parties' previous focus in the litigation was on provision 5.b. On May 16, Restaurantware answered "yes," but without specifically identifying the foreign websites. (Dkt. 35-2 at Resp. to Interrog. No. 12).

3

## II. LEGAL STANDARDS

The admissibility of expert witness testimony is governed by Fed. R. Evid. 702 and the Supreme Court's opinion in *Daubert*, 509 U.S. 579. *See Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017).[4] The district court thus acts as "an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand," and "holds broad discretion . . . of determining the relevance and reliability of the expert opinion testimony." *Id.* at 674 (citations omitted). Thus, "[b]efore admitting expert testimony under *Daubert* and Rule 702, a court must determine: 1) whether the witness is qualified; 2) whether the expert's methodology is scientifically reliable; and 3) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *United States ex rel. Danielides v. Northrop Grumman Sys.*, No. 09 CV 7306, 2015 U.S. Dist. LEXIS 137380, at *10 (N.D. Ill. Oct. 8, 2015) (Shah, J.) (citation omitted). "The party seeking to introduce the expert witness testimony bears the burden of demonstrating that the expert witness testimony satisfies the standard by a preponderance of the evidence." *Krik*, 870 F.3d at 673.

A determination of whether an expert is qualified requires "comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Callahan v. City of Chi.*, 78 F. Supp. 3d 791, 804 (N.D. Ill. 2015) (Shah, J.) (quoting *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010)).

As to the reliability prong, the Seventh Circuit has stated that courts should consider several factors, including "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated

---

[4] "Federal Rule of Evidence 702 and *Daubert* . . . govern the admission of expert testimony in federal courts, even when [the] jurisdiction rests on diversity." *C.W. v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015).

in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Krik*, 870 F.3d at 674 (citations omitted).

And to be relevant, the expert opinions must—at the very least—relate to the allegations in the complaint. *See, e.g., Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (citation omitted); *McCarthy v. Target Corp.*, No. 09 C 1548, 2012 U.S. Dist. LEXIS 50561, at *18 (N.D. Ill. Mar. 19, 2012) ("[expert's] opinions are not relevant or helpful because they do not relate to the factual allegations pled by [plaintiff] as the basis for her claims[.]").

### III. ARGUMENT

#### A. Mr. Hartzer's Opinions On The Relationship Between PNW And The Foreign Websites, And the Use of Slogans on the Foreign Sites Should Be Excluded

Mr. Hartzer's **Opinion 3** is that "5 of the 8 websites owned and/or operated by, and/or otherwise affiliated or related to First Pack" use certain prohibited slogans. This Opinion is predicated on whether First Pack "owned and/or operated" or was "otherwise affiliated or related to" these websites. Mr. Hartzer devotes a substantial amount of his report discussing certain other entities he believes are associated with PNW, such as PackNWood UK, PackNWood Germany, PackNWood France, etc. ("foreign websites") (Ex. 3, Hartzer at ¶¶ 13-24).

Mr. Hartzer concludes, only by looking on the packnwood.com website, that "[t]he way that these offices, locations, and websites are presented on the Pack N Wood website leads me to believe that all of these offices, locations, and websites are owned by, affiliated with, or related to the same company First Pack. It is also reasonable to expect that First Pack has control over the websites that are linked to on this page." (*Id.* at ¶ 16-17). He also states that "[b]ased on my observations and having navigated to these websites directly from the packnwood.com internet website in the United States," that PNW continues to use the prohibited slogan, because of the

5

eight foreign websites, five contain a slogan listed in Paragraph 5.a. of the Agreement.[5] In Mr. Hartzer's "professional opinion, this usage is in violation of the Agreement." (*Id.* at ¶ 20.)

These opinions should be excluded for a number of reasons. First, Mr. Hartzer's conclusions are based on nothing more than navigating public websites. It's unclear what special expertise he has in this area, or how he is any more qualified to reach this conclusion than any fact witness or finder of fact who can similarly access these public websites and draw his or her own conclusions. An expert "relying solely or primarily on experience" for his opinion, must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Danielides*, 2015 U.S. Dist. LEXIS 137380, at *13 (citation omitted).

Second, whether the websites are "owned by, affiliated with, or related to the same company First Pack," is a legal question that cannot be answered simply by navigating websites. One must look to corporate formation papers, articles of incorporation, etc., or through fact discovery which Restaurantware belatedly realized that it failed to do. (*See* Dkt. 36.) Simply put, Mr. Hartzer has no expertise in corporate law, has not studied any formation papers or the relationship between PNW and foreign companies, and his opinion about whether PNW owns or operates the foreign websites is unreliable and should be stricken. And, in fact, the foreign websites are not owned or operated by PNW. (Ex. 5, Merran Decl.)

Third, Mr. Hartzer's "professional opinion," that the usage of the slogan on the foreign websites is "in violation of the Agreement" (Ex. 3, Hartzer at ¶ 20) is an impermissible legal conclusion. *See, e.g., Danielides*, 2015 U.S. Dist. LEXIS 137380, at *16 ("expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible," striking testimony

---

[5] For two of these five terms, the translations that Mr. Hartzer provides are not actually prohibited slogans because they are not listed in paragraph 5.a. of the Agreement. (Ex. 3, Hartzer at ¶ 19.)

6

where "[a]n expert witness may not testify simply regarding his reading of a contract, and that is what [expert] has done here."); *PolyOne Corp. v. Lu*, No. 14 CV 10369, 2018 U.S. Dist. LEXIS 167482, at *28 (N.D. Ill. Sept. 28, 2018) (Shah, J.) (expert "cannot testify to what is and what is not a trade secret, because it is a legal conclusion that experts are not entitled to make."); *Callahan*, 78 F. Supp. 3d at 805 ("[expert] may not offer an opinion on what is required under the ADA . . . What is required by the ADA is an issue of law, not of fact, and thus is not an appropriate topic for expert-witness testimony."). As the Court previously noted, Mr. Hartzer:

> is not an appropriate person to opine about whether there has been a breach of the settlement agreement. That kind of conclusion is really a legal conclusion that's not for him to make. He likely doesn't have an adequate foundation or expertise to opine on this defendant's legal responsibility for statements contained on other entity websites.

(Ex. 1, 02/14/2019 Hr'g Tr. at 8:8-14.)

Fourth, and most fundamentally, even if the foreign websites were owned by PNW, or were under its control, Mr. Hartzer's opinions would still be irrelevant. The Amended Complaint alleges a theory of recovery based on the bidding on search terms, not showing a slogan on the website, and thus expert opinions on theories of recovery not pled in the complaint are irrelevant. *See, e.g., Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (citation omitted); *McCarthy*, 2012 U.S. Dist. LEXIS 50561, at *18 ("[expert's] opinions are not relevant or helpful because they do not relate to the factual allegations pled by [plaintiff] as the basis for her claims[.]"). The Court already recognized this when refusing Restaurantware's motion to reopen fact discovery on this issue. (Ex. 1, 02/14/2019 Hr'g Tr. at 7:17-21.)

Mr. Hartzer's **Opinion 3** should therefore be excluded. His related **Opinion 2** is that he "sees direct evidence that First Pack used one or more of the [prohibited slogans] or similar." Mr. Hartzer's report does not claim that PNW's website contained this slogan, so the basis for this

7

opinion is that the slogans appeared on the foreign websites, that were purportedly related to PNW. For the reasons discussed above, the opinions about the foreign websites should be excluded, and thus Mr. Hartzer's **Opinion 2** should be stricken as well.

### B. Mr. Hartzer's Opinions On What is Considered "Printed Material" Should Be Excluded

Mr. Hartzer's opinion that websites are not "printed material" within the context of the Agreement, because in the field of internet marketing, "printed" materials are printed on ink and paper, (Ex. 3, Hartzer at ¶ 21), should also be stricken. Even if the Court were to accept Mr. Hartzer's expertise in the field of internet marketing, "[t]he trial court's gatekeeping function requires more than simply taking the expert's word for it." *Danielides*, 2015 U.S. Dist. LEXIS 137380, at *14 (citations omitted) (excluding expert's testimony of what a phrase means in a government contract, where expert failed to explain how his experience gave him specialized knowledge to understand what the term meant in the industry). Moreover, this opinion is directly contradicted by Restaurantware's own position on the matter, as Restaurantware admitted that "as used in the Agreement At-Issue, 'catalogs or other printed material' refers to materials printed online as well as in paper form." (Ex. 6, Restaurantware's Response to Requests for Admission at No. 6.) *See McCarthy*, 2012 U.S. Dist. LEXIS 50561, at *25 ("[plaintiff] cannot offer [expert's] opinion" on an issue "as that opinion contradicts her Rule 36 admission.").

### C. Mr. Hartzer's Calculation of Damages Based on the Use of the Slogan on Foreign Sites Should Be Excluded As Unreliable

Even if slogans appearing on foreign websites were relevant to the issues in this case—and they are not—Mr. Hartzer's methodology for calculating lost revenues to Restaurantware from these slogans, the basis for his **Opinion 6** (on page 29),[6] is completely unreliable. Mr. Hartzer's overall methodology is premised on the idea that consumers reached a foreign website,

---

[6] Mr. Hartzer's opinions on pages 4-5 differ slightly from those he provides on pages 27-29.

8

saw a prohibited slogan, and, therefore, all the traffic to and conversions (i.e., sales) at these websites represent lost traffic and conversions (and revenue) to Restaurantware. However, this involves two implicit (and completely unreasonable) assumptions. First, that the presence of the slogan is driving *all* the traffic to (and conversions at) the foreign websites. In other words, if the slogan were absent from these websites, then there would be no visitors to those websites, and no conversions from this traffic on the websites. As explained in the report of PNW's expert, Dr. Jerath, this is faulty analysis, and the scientifically correct way to estimate this change is to compare the traffic or conversions on these websites with vs. without the slogan. (Ex. 4, Jerath Report at ¶¶ 32, 34.) The second assumption is that if potential consumers had not visited one of these sites, they would have visited Restaurantware's website and would have conducted the same activity there. As explained by Dr. Jerath, this too is unsupported. (*Id.* at ¶ 33.)

Mr. Hartzer does not discuss (1) whether this theory of damages can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community, *see Krik*, 870 F.3d at 674, and this methodology is flawed on its face. Apart from that, certain specific assumptions are unwarranted, as discussed below:

1. **Mr. Hartzer Overestimates Website Traffic**

The first step in Mr. Hartzer's analysis is calculating how many people from the United States visited the foreign websites that contained the slogans. He does this by taking data from SEMrush.com, which only accounts for traffic from Google (rather than Bing, Yahoo, etc.) and simply doubling it to account for other search engines. (Ex. 3, Hartzer at ¶ 25.) Based on this doubling, Mr. Hartzer calculates that "[t]he total number of visitors from the United States to the First Pack Si[t]es that contain RW Slogans and Marks" is approximately 5,000 visitors since December 2016. (*Id.* at ¶ 32.) But simply "doubling" the website traffic is unreliable, because,

9

based on SEMRush's own blog entry, Google accounts for 64% (not 50%) of the market. (Ex. 4, Jerath Report at ¶¶ 41-46.)

### 2. Mr. Hartzer Uses a Highly Exaggerated Conversion Rate

After calculating traffic from the United States to the Foreign Websites containing the slogan, Mr. Hartzer relies on a 10% conversion rate, meaning that of the 5,000 visitors to the foreign websites, 500 of them would have purchased a product. (Ex. 3, Hartzer at ¶ 33.) But Mr. Hartzer's 10% conversion rate is also highly inflated. Mr. Hartzer does not base this conversion rate on any conversion data produced in this litigation (which was available to him, *see* Ex. 7, PNW0000352; Ex. 8, RW0009[7]), but rather on an estimate from a website called marketingsherpa.com. (Ex. 3, Hartzer at 34.) But the very study that Mr. Hartzer relies on states "[y]ou must understand that the above data shows averages, which have been *skewed up* due to some responses that were much higher than average." (Ex. 4, Jerath Report at ¶ 48.) Dr. Jerath's data based on peer-reviewed studies shows much lower conversion rates. (*Id.* at ¶ 51.)

### 3. Mr. Hartzer's Calculation of Lost Revenue is Unsupported

After calculating the 500 "misdirected" sales (10% of the 5000 visitors to the foreign websites from the U.S.), Mr. Hartzer multiplies 500 by Restaurantware's average order size of $342.30, to get $171,150 in purportedly lost revenue to Restaurantware since 2016. (Ex. 3, Hartzer at ¶ 37.) Again, the assumption here is that each conversion at one of the foreign websites is a misdirected sale that would have otherwise occurred at Restaurantware. But Mr. Hartzer does not contend that visitors came to the websites *because of* the slogan, nor does he attempt to create a causal connection between the traffic or conversion at these websites and the slogan. He does not address the possibility that someone might have purchased a product on a

---

[7] While the conversion rate data was for online search terms that did not include the primary term Mr. Hartzer focuses on, it included other terms that each party was prohibited from using, so this data would have been relevant to Mr. Hartzer's analysis.

foreign website simply because they preferred the products sold there over those sold by Restaurantware, that the products on the foreign websites were less expensive, or hundreds of other factors that influence consumer behavior. *See PolyOne Corp.*, 2018 U.S. Dist. LEXIS 167482, at *24-25 ("One factor courts can consider when evaluating the reliability of an expert's methodology is [w]hether the expert has adequately accounted for obvious alternative explanations.") (citation and quotation marks omitted).

### 4. Mr. Hartzer's Calculation of LTV is Unsupported

Next, Mr. Hartzer calculates the average lifetime value (LTV) of each customer. He does this by multiplying the average order ($342.30) by the purchase frequency (2.97) by the customer lifespan (10 years) to get $10,170 in the LTV of each customer. When multiplied by the 500 purportedly "misdirected" customers, this comes to over $5 million in purported lost revenue to Restaurantware over ten years. (Ex. 3, Hartzer at ¶ 37.)

The general problem with this approach is that Mr. Hartzer again assumes that the slogan is driving the entirety of the LTV of a customer. As Dr. Jerath explains, Mr. Hartzer's analysis is that a customer lands on a website and views the slogan, and then this viewing of the slogan is not only the sole factor in making the customer purchase at the time of the visit, but is also the sole factor in making the customer purchase for *all* of his/her lifetime with the company. (Ex. 4, Jerath Report at ¶ 35.) To get an accurate picture, one must calculate the *changes* in the values of the average order, purchase frequency, and customer lifespan due to the customer viewing the slogan at their first visit, which Mr. Hartzer has not done. (*Id.* at ¶ 36.)

Moreover, even the website Mr. Hartzer sites to support his methodology, https://blog.hubspot.com/service/how-to-calculate-customer-lifetime-value, (Ex. 3, Hartzer at Table in ¶ 37) shows that there are various different approaches to calculating LTV, and three different LTV formulas yield completely different results. (Ex. 4, Jerath Report at ¶ 56.).

11

### 5. The Remainder of Mr. Hartzer's Report Compounds These Errors

Mr. Hartzer uses the same approach discussed above to calculate a few additional data points. He first calculates traffic and conversions to the packnwood.com website (the website of the defendant, PNW), arguing that "[i]t's important to measure the traffic from packnwood.com because the website is linked from other First Pack owned websites that contain [Restaurantware] slogans and marks. As a result, the search engines are seeing packnwood.com as being relevant—and showing packnwood.com in the search engine result pages for [Restaurantware] slogans and marks." (Ex. 3, Hartzer at ¶ 38.) It is unclear what this means, as it is undisputed that PNW's website does not display any prohibited slogan, and Mr. Hartzer does not opine otherwise. Nor does he explain or quantify how search engines are "seeing packnwood.com as being relevant" or how this results in lost revenue to Restaurantware. Nevertheless, Mr. Hartzer counts every conversion on PNW's site as being a lost sale to Restaurantware. (*Id.* at ¶ 42-43.)

He also engages in the same analysis described above for the UK and French websites, but from Google UK and Google France (as opposed to Google US), and adds those results. (*Id.* at ¶ 39-40.) Finally, he analyzes a website bioandchic.com, (discussed in the next section), adds up all of these results, and calculates that $2 million in lost revenues since 2016 and $61 million in lost LTV revenue to Restaurantware, using the same flawed methodology discussed above.

The methodology discussed above is the basis for Mr. Hartzer's **Opinion 6** (on page 29), which, apart from being irrelevant, is wholly unreliable, and should be excluded in its entirety.

### D. Mr. Hartzer's Opinions on Bio and Chic and Google Search Results Should Be Excluded

While the majority of Mr. Hartzer's report addresses issue of slogans appearing on foreign websites, the end of his report briefly touches on the issue of PNW bidding on certain

12

prohibited search terms. Mr. Hartzer's **Opinion 4** (on page 5)[8] is that he "see[s] no direct evidence that First Pack has purchased or bid on any online keyword search term" using the prohibited search terms. PNW does not challenge this portion of Mr. Hartzer's opinion. However, he also states that "[i]t is my professional opinion that First Pack has not made any effort to exclude the [the prohibited search terms] from its paid advertising campaigns. Consequently, the First Pack sites show up (or previously showed up) in the paid advertising section of Google search results." This portion of his opinion is based on unreliable methodology and should be excluded.

First, Mr. Hartzer opines the website bioandchic.com (which he "assumes" is "affiliated with or owned by First Pack/Pack N Wood") bid on certain prohibited search terms. (Ex. 3, Hartzer at ¶ 44.) To form this opinion, Mr. Hartzer states that he received a screen capture for a certain search term, and that based on his review of this capture "it is clear to me that the bioandchic.com website, owned by First Pack, was bidding and purchasing a keyword or keywords that included an RW Keyword or product number." (*Id.* at ¶ 45-46.) That is the entirety of Mr. Harzer's analysis, and he does not explain why this is "clear" to him, or the reasoning behind this conclusion. Again, Rule 702 and *Daubert* require "that the expert explain the methodologies and principles that support his opinion; he cannot simply assert a bottom line," and "[t]he trial court's gatekeeping function requires more than simply taking the expert's word for it." *Danielides*, 2015 U.S. Dist. LEXIS 137380, at *13, 14 (citations and internal quotation marks omitted).

Mr. Hartzer also states that he searched for the term "bio and chic [prohibited term]" and saw a sponsored ad for bio and chic. (Ex. 3, Hartzer at ¶ 47.) He concludes that "[t]his website is showing up in the search results . . . because First Pack has made no effort . . . to exclude

---

[8] This is similar to his **Opinion 5** on page 29.

13

[prohibited term] in its paid advertising campaign through Google." (*Id.* at ¶ 48.) Again, Mr. Hartzer does not explain why that is, and just asks the Court to take his word for it. And, he seems to be oblivious to the obvious alternative explanation that the website for bio and chic is coming up because he included "***bio and chic*** [prohibited term]" as part of the search string. *See PolyOne Corp.*, 2018 U.S. Dist. LEXIS 167482, at *24-25 ("One factor courts can consider when evaluating the reliability of an expert's methodology is [w]hether the expert has adequately accounted for obvious alternative explanations.") (citation and quotation marks omitted). Mr. Hartzer does the same thing with "[prohibited term] packnwood" and again sees results for packnwood, but refuses to acknowledge the obvious possibility that he is seeing ads for packnwood because this was included as part of the search string, not because PNW failed to add a negative keyword for a prohibited search term. And in fact, when Dr. Jerath ran this search but without "packnwood" or "bioandchic" in the search string, he did not see the same results. (Ex. 4, Jerath Report at ¶¶ 63-65.)

Mr. Hartzer also opines that it is his "professional opinion that First Pack may have not excluded the RW Phrases from its advertising campaigns on purpose," and that "First Pack has the ability to contact [press release company] and ask or demand that the press release be removed." (Ex. 3, Hartzer at ¶ 51, 58.) Again, there is no explanation for what Mr. Hartzer bases this on, and "[a] court is expected to reject any subjective belief or speculation." *Danielides*, 2015 U.S. Dist. LEXIS 137380, at *17 (internal citation marks omitted) (excluding opinion where expert "is not a fact witness and lacks direct knowledge of [parties'] state of mind."); *see also DePaepe v. GMC*, 141 F.3d 715, 720 (7th Cir. 1998) (error to permit expert, who was not a fact witness, to testify that defendant had a motive "to save money.").

14

Finally, Mr. Hartzer's **Opinion 4** (on page 28), is that "packnwood.com is benefitting from the keyword since Google sees [prohibited term] appearing on other First Pack owned websites, and thus continues to think [prohibited term] and [p]acknwood.com are related and associated with eachother." Mr. Hartzer elaborates on this opinion in ¶ 54 of his report, but again, his basis for this conclusion is only his "professional opinion," without any explanation. For this reason (and also because Mr. Hartzer has no basis to opine that the foreign websites were owned or operated by PNW), this opinion should be excluded as well.

### IV.     CONCLUSION

For the foregoing reasons, Mr. Hartzer's opinions discussed above should be excluded. Thus, the only opinions that should be permitted are Mr. Hartzer's **Opinion 1** (that he "sees no evidence that Restaurantware has bid on any Prohibited Keywords") and the portion of **Opinion 4** (on page 5) that Mr. Hartzer "see[s] no direct evidence that First Pack has purchased or bid on any online keyword search term using the [prohibited terms]." The rest of Mr. Hartzer's opinions should be stricken.

Date:  March 29, 2019

Respectfully submitted,

By: */s/ Steven L. Baron*
Steven L. Baron (ARDC 6200868)
George V. Desh (ARDC 6305733)
sbaron@mandellmenkes.com
gdesh@mandellmenkes.com
Mandell Menkes LLC
1 North Franklin St., Suite 3600
Chicago, IL 60606
Phone: (312) 251-1009

*Attorneys for Defendant, FIRST PACK LLC d/b/a Pack N Wood*

15

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing has been served on March 29, 2019 via the Court's CM/ECF system on all counsel of record who have consented to electronic service.

*/s/ Steven L. Baron*
